FILED
2003 JUN 16 AM 11: 00
SIOUX CITY DIV. OFFICE
BY

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| THERESA M. ZEIGLER, Individually; ) | |
| THERESA M. ZEIGLER, as mother and ) | |
| next friend of MADISEN ZEIGLER, ) | Case No. C01-3089MWB |
| ) | |
| Plaintiffs. ) | MOTION TO PRECLUDE |
| ) | TESTIMONY OF PLAINTIFFS' |
| v. ) | EXPERT BRUCE WANDELL |
| ) | |
| FISHER-PRICE, INC. ) | ORAL ARGUMENT |
| ) | REQUESTED |
| Defendant. ) | |

COMES NOW, the Defendant Fisher-Price, Inc. (Fisher-Price) and for its motion to preclude expert testimony of Bruce Wandell, respectfully states to the Court as follows:

1.     Defendant Fisher-Price respectfully submits this motion pursuant to *Daubert v. Merrill Dow Pharmaceuticals Inc.*, 509 U.S. 579 (1993) and The Federal Rules of Evidence to preclude the proffered opinion testimony of Bruce Wandell, designated by Plaintiffs as a trial expert.

2.     Plaintiffs in this action seek to recover for property damage as a result of a fire that occurred on June 1, 2001. Allied Insurance has brought this action in the name of its insured, Theresa M. Zeigler, to recover amounts paid under the terms of Mrs. Zeigler's homeowner's insurance policy.

Case 3:01-cv-03089-PAZ   Document 96   Filed 06/16/03   Page 1 of 21

3. Plaintiffs contend that the fire was caused by a Fisher-Price battery operated toy known as a Power Wheels. Plaintiffs claim that the batteries of the toy were being charged in the Zeigler garage at the time of the fire.

4. Defendants contend that there is insufficient evidence to ascertain the cause or origin of the fire under accepted scientific principles of fire investigation, therefore the cause and origin of the fire must be considered "undetermined' under standards accepted in the scientific community of fire investigators.

## PROCEDURAL BACKGROUND

4. On July 19, 2002, Plaintiffs served Plaintiffs' Expert Witness Disclosure of Bruce Wandell, a copy of which is submitted herewith in a combined binder of all exhibits.

5. Attached to Plaintiff's expert disclosure of Bruce Wandell is a report of Mr. Wandell. The report is undated but contains the heading, "Date of loss 6/1/01." In his report, Mr. Wandell expresses the opinion that, "The fire originated along the north wall of the garage in the area near the southeast corner of the pantry."

6. Mr. Wandell gave deposition testimony on May 13, 2003. A copy of the transcript of this deposition is submitted herewith in a combined binder of all exhibits.

7. Mr. Wandell's testimony should be stricken and should not be permitted. In his testimony, Mr. Wandell admits that he failed to follow generally accepted scientific methods for fire investigation and for forming conclusions with respect to issues surrounding the cause and origin of fire as set forth in National Fire Protection Association 921 for Fire and Explosion Investigations. As Mr. Wandell's testimony is not the product of reliable scientific principles and methods, and as Mr. Wandell has not

applied scientific principles and methods to the facts of the case, his expert testimony and the appropriate scientific expressions of opinion set forth therein should not be permitted.

## LEGAL STANDARDS FOR ADMISSION OF EXPERT TESTIMONY AT TRIAL

8.     Under the Federal Rules of Evidence, Rule 702, expert testimony is admissible if the expert is qualified, if the testimony will assist the trier of fact and if the testimony meets three requirements:

      (a)  The testimony is based on sufficient facts or data;

      (b)  The testimony is the product of reliable principles and methods; and

      (c)  The witness has applied the principles and methods reliably to the facts of the case.

9.     In *Daubert v. Merrill Dow Pharmaceuticals*, 509 U.S. 579 (1993) the Supreme Court held, "The trial judge must ensure that any and all scientific testimony admitted is not only relevant, but reliable."   The Court serves as a "gatekeeper" to bar the introduction of conjecture by witnesses who are not qualified by knowledge and experience to render truly expert opinions on the matter of issues and whose proffered testimony is not supported by "appropriate validation and reliable scientific method." *Daubert,* at 590.

9.     The party offering the expert testimony bears the burden of proof in establishing its admissibility.   *Daubert* at 592, N.10.

## MR. WANDELL'S OPINIONS

10.     Mr. Wandell formulated and expressed an opinion regarding the origin of the fire, without following the accepted scientific methods set forth in NFPA 921 for fire investigation.  First, Mr. Wandell formulated opinions prior to gathering all evidence. Second, Mr. Wandell discontinued the collection of evidence following the formulation

of his opinions. Third, Mr. Wandell did not follow proper procedure in documenting, either in written form or by photographs, crucial findings upon which he bases his opinion. The methodology and procedures are in stark contrast to and not in compliance with the explicit requirements of NFPA 921 which Mr. Wandell admits is the accepted guide for conducting fire cause and origin investigations. Since Mr. Wandell has not applied the accepted scientific principles and methods reliably to the facts of this case, the Court should exercise its role as gatekeeper to bar the introduction of his testimony, which is not supported by appropriate validation and reliable scientific method required under Federal Rules of Evidence and *Daubert*.

11.     Mr. Wandell admitted that he had no training or expertise that would allow him to testify with a reasonable degree of certainty as to whether any part of the Power Wheels car operated improperly as to cause a fire. (Wandell Deposition, Page 148). Mr. Wandell's opinions were not directed to issues involving the product, but instead limited to the issue of where the fire allegedly originated.

## NFPA 921 IS THE ACCEPTED GUIDE FOR FIRE CAUSE AND ORIGIN INVESTIGATION

12.     Mr. Wandell testified that he agreed that NFPA 921 is accepted as guide for the investigation of fire and explosion cause and origin by the fire investigation community. (Wandell Deposition, Page 136-138).

13.     Mr. Wandell admitted that he is not aware of any other consensus-generated document that serves as a guideline for fire investigation other than NFPA 921. (Wandell Deposition, Page 136-138).    Mr. Wandell does not dispute that NFPA 921 has been approved as an American National Standard Institute (ANSI) standard as of April 2, 1998. (Wandell Deposition, Page 136-138).

4

14.     Mr. Wandell, further, agrees that NFPA 921 was developed by the Technical Committee of fire investigations to assist in improving fire investigation process and the quality of information on fires resulting from the investigative process. (Wandell Deposition, Page 137).

15.     Mr. Wandell agrees that NFPA 921 was used by both public sector employees and private employees who are responsible for fire investigation and for investigation for insurance and litigation purposes. (Wandell Deposition, Page 137).

16.     Mr. Wandell agrees with the pronouncement set forth in NFPA 921 that requires that the scientific method be used as the appropriate methodology in investigating a fire scene. (Wandell Deposition, Page 139).

## MR. WANDELL'S OPINIONS WERE NOT FORMED IN ACCORDANCE WITH THE METHODOLOGY REQUIRED UNDER NFPA 921

17.     Notwithstanding Mr. Wandell's admission that NFPA 921 requires that the scientific method be used to investigate a fire scene, Mr. Wandell did not follow the scientific method set forth in NFPA 921 in investigating the Zeigler fire scene, therefore, his testimony should be stricken as lacking the requisite scientific basis required by Federal Rules of Evidence 702, *Daubert* and its prodigy.

18.     Mr. Wandell agreed that NFPA 921 Chapter 2.3.5 requires that a hypothesis must be based on empirical data that the investigator has collected.

19.     The first substantive chapter of NFPA 921 is entitled "Basic Methodologies." This chapter sets forth the substance of the scientific method required under NFPA 921 as follows

> 2-1     Nature of Fire Investigations . . . The compilation of factual data, as well as an analysis of those facts, should be

accomplished objectively and truthfully. The basic methodology of the fire investigation should rely on the use of a systematic approach and attention to all relevant details. The use of a systematic approach often will uncover new factual data for analysis, which may require previous conclusions to be reevaluated. With a few exceptions, the proper methodology for a fire or explosion investigation is to first determine and establish the origin(s), then investigate the cause: What circumstances, conditions, or agencies caused the ignition source, fuel, and oxidant to come together?

2-2    Systematic Approach. The systematic approach recommended is that of the scientific method, which is caused in physical sciences. This method provides for the organizational and analytical process so desirable and necessary in a successful fire investigation.

2-3    Relating Fire Investigation to the Scientific Method. . . . The scientific method is applied using the following six steps.

2-3.1    Recognize the Need. First, one should determine that a problem exists . . .

2-3.2    Define the Problem. Having determined that a problem exists, the investigator or analyst should define in what manner the problem can be solved. In this case, a proper origin and cause investigation should be conducted. This is done by an examination of the scene and by a combination of other data collection methods, such as the review of previously conducted investigations of the incident, the interviewing of witnesses or other knowledgeable persons, and the *results of scientific testing*.

2-3.3 Collect Data. Facts about the fire incident are now collected. *This is done by observation, experiment, or other direct data gathering means.* This is called empirical data because it is based on observation or experience and is capable of being verified.

2-3.4 Analyze the Data (Inductive Reasoning). All of the collected and observed information is analyzed by inductive reasoning. This is the process in which the total body of empirical data collected is carefully examined in the light of the investigator's knowledge, training, and experience. *Subjective or speculative information cannot be included in the analysis, only facts that can be clearly proven by observation or experiment.*

2-3.5 Develop a Hypothesis. Based on the data analysis, the investigator should now produce a hypothesis or group of hypothesis to explain the origin and cause of the fire. . . *This hypothesis should be based solely on the empirical data that the investigator has collected.*

2-3.6 Test the Hypothesis (Deductive Reasoning). All other reasonable origins and causes should be eliminated. The investigator does not have a truly provable hypothesis unless it can stand the test of careful and serious challenge. This is done by the principle of deductive reasoning, in which the investigator compares his or her hypothesis to all known facts. If the hypothesis cannot withstand an examination by deductive reasoning, it should be discarded as not provable and a new hypothesis tested. This may include the collection of new data or the reanalysis of existing data. *This process needs to be continued until all feasible hypothesis have been tested. Otherwise the fire cause should be listed as "undetermined."*

7

2-3.6.1 Presumption of Cause. *Until data have been collected, no specific hypothesis can be reasonably formed or treated. All fires, however, should be approached by the investigator without presumption.*

2-4 Basic Method of a Fire Investigation. Using the specific . . .should involve the following five major steps from the inception through final analysis.

2-4.1 Receiving the Assignment. The investigator should be notified of the incident, what his or her role will be, and what he or she is to accomplish. . . .

2-4.2 Preparing for the investigation, the investigator should marshall his or her forces and resources and plan the conduct of the investigation. Preplanning at this stage can greatly increase the efficiently and therefore the chances for success of the overall investigation. Estimating what tools, equipment and personnel (both labors and experts) will be needed can make the initial scene investigation as well as subsequent investigative examinations and analyses, go more smoothly and be more productive...

2-4.3 Conducting the Investigation. The investigator should conduct an examination of the scene, if it is available, and collect data necessary to the analysis . . .

2-4.4Collecting and Preserving Evidence. *Valuable physical evidence should be recognized, properly collected, and preserved* for further testing and evaluation or courtroom presentation.

2-4.5Analyzing the Incident. All collected and available data should be analyzed using principles of the scientific method. . . Conclusions should be drawn according to the principles expressed in this guide.

8

2-5     Reporting Procedure. NFPA 921,
Guide for Fire and Explosion Investigations,
1998 Edition (Emphasis Supplied).

NFPA 921, Guide for Fire and Explosion Investigations, 1998 Edition, (Emphasis

supplied). Copies of Chapter  2 , part of Chapter 8, Chapter 11 and Chapter 12  of NFPA

921 are submitted herewith in a combined binder of all exhibits.

20.     Chapter 2 of NFPA 921 requires a fire investigator to approach a fire

scene without a preconceived hypothesis.

21.     NFPA 921, further, requires that until data had been collected, no specific

hypothesis can be reasonably formed or treated.  (NFPA 921, 2-3.6.1)

22.     NFPA 921, further, contains specific directives with respect to fire

investigators who purport to offer opinions regarding the origin of the fire.  Chapter 11

provides as follows:

> 11-1 Introduction.  This chapter will recommend a
> procedure to follow in determining the origin of a fire.
> Chapter 12 will further develop the investigative effort
> based on the results from the origin determination.
> Generally, if the origin of a fire cannot be determined,
> the cause cannot be determined.
>
> Determination of the origin of the fire frequently
> involves the coordination of information derived
> from the following:
>
> > (a)  The physical marks (fire patterns) left
> >      by the fire;
> >
> > (b)  The observations reported by persons
> >      who witnessed the fire or were aware
> >      of conditions present at the time of
> >      the fire;

(c) The analysis of the physics and chemistry of fire initiation, development and growth as an instrument related known or hypothesized fire conditions capable of producing those conditions.

In some instances, a single item such as a irrefutable article of physical evidence or dependable eyewitness to the initiation, can be the basis for a conclusive determination of origin. In most cases, however, no single item is sufficient in itself. The investigator then should use all of the available resources in developing potential scenarios and determine which scenarios plausibly fit all of the evidence available.... In some cases it will be impossible to unquestionably fix the origin of a fire. It is important that the determination of a single point of origin not be made *unless the evidence is conclusive.* If a single point cannot be identified, it can still be valuable for many purposes to identify possible sources of origin. In such instances the investigator should provide a complete list of plausible explanations for the origin with the supporting evidence for each opinion.

NFPA 921 Chaper 11-1( Emphasis supplied).

24.     Chapter 11-4 provides as follows:

The development of the preliminary scenario is a critical point in the investigation. It is important at this stage that the investigator attempt to identify any other feasible scenarios and, through the remaining course of the investigation, keep these alternative scenarios under consideration until or at such time as conclusive evidence or rationale is developed for setting them aside.

*One very important consideration should be kept in mind, however, the investigation should not be planned solely to prove the preliminary scenario to the detriment of maintaining an unbiased mind.* The investigation is intended to identify all facts that exist and to use those facts to develop opinions based on sound, fire science principles and experience. The investigative effort may

> cause this scenario to change many times before
> the final opinion is formed. These changes are
> why the scenario should be considered preliminary
> until the investigation is completed. A narrow-
> minded approach to this effort prevents the normal
> development of this scenario from preliminary
> to final. In this case, Mr. Wandell ignored the
> well established principle set forth in NFPA 921.

NFPA 921, Chapter 11-4 (Emphasis supplied).

23.     Mr. Wandell testified that, rather than maintaining the open mind required

of a fire investigator under the principles set forth in NFPA 921, he, instead, formed an

opinion prior to the collection of empirical data and failed to collect other data that would

potentially challenge or test his opinion.

24.     Mr. Wandell admitted that he formed his opinion regarding the origin of

the fire before he completed his investigation of the fire after he had heard from a co-

worker at Allied that there was a recall in the Power Wheels toy. Mr. Wandell testified

as follows:

> Q.     During the course of investigating the Zeigler fire,
>         did you form any hypothesis relative to the area of
>         fire origin?
>
> A.     I formed an opinion.
>
> Q.     When did you form that opinion?
>
> A.     Following the examination of the physical evidence at the
>         fire scene.
>
> Q.     And was that on the first day that you went to the fire
>         scene?
>
> A.     Yes.
>
> Q.     That was before you went to the fire department?
>
> A.     Yes.

Q.     Was that before you took the recorded statement from
       Mrs. Zeigler?

A.     Yes.

Q.     Was that before you took your photographs?

A.      No.

Q.     Was it after you heard from Mr. Wright that he thought
       there was a recall on the Power Wheels toy?

A.     Yes.

Q.     So you formed your opinion before you left the Zeigler
       House and before you took Mrs. Zeigler's statement?

A.     Yes.  I formed my opinion of where the fire had
       originated and what was in that area.   Yes.  That
       may have caused the fire.

Q.     And after you formed that opinion did you continue
       to gather evidence.  For example, evidence of what
       was on the south wall of the garage?.

A.      No.

Q.     Did you collect any data as to any other items that
       May have been located along the west wall of the
       Garage?

A.     No.

Q.     You wrote your opinion, which is set forth in
       Exhibit 3, before you had an opportunity to review
       The fire department report, is that correct?

A.     Yes.

Q.     As you sit here you don't have notes of your
       observations at the fire scene other than what is
       recorded in your opinion which is Exhibit 3.

A.     Yes.

25.    In terminating his investigation and information gathering following the formation of his opinion, Mr. Wandall violated the most basic scientific tenets of fire cause and origin investigation, which requires the investigator to retain an open mind and to continually test hypotheses until all information has been gathered, to continually review and analyze hypothesis before formulating final opinions.

26.    Mr. Wandell operated precisely opposite to the manner required by NFPA 921. Rather than following the approved and acknowledged scientific method set forth in NFPA 921, Mr. Wandell, instead formulated his opinion upon arriving at the fire scene, after hearing that one of the items in the garage, the Power Wheels toy, had been the subject of a recall.

27.    Mr. Wandell's expression of opinion is made outside the realm of accepted scientific practice and contravenes the agreed upon and acknowledged guidelines for conducting such fire cause and origin investigations and for proper scientific based opinions in connection with the same.

29.    Mr. Wandell admitted that he stopped his investigation involving the origin of the fire after he had formulated his opinion that the fire originated on the north wall, where the Power Wheels toy that had been the subject of the recall had been located. Mr. Wandell never asked Mrs. Zeigler, for example, what was located on the south wall of the garage, (at his deposition he was asked the following questions and gave the following answers):

> Q.    So you didn't ask her what was located on the south wall?
>
> A.    I don't recall asking.

Q.    Do you recall her telling you anything that was on
      the south wall?

A.    I don't recall.

Q.    As you sit here today, do you know what was on the
      south wall of the garage?

A.    No I don't.

(Wandell Deposition, Page 46)

28.    Mr. Wandell did not make any inquires to determine any of the items that
may have been on the west wall of the garage. During his deposition, Mr. Wandell gave
the following testimony:

Q.    Did you ask her to list all the items that were on the
      West wall?

A.    No I did not.

( Wandell Depositon, Page 46).

29.    Similarly, after Mr. Wandell formed the opinion that the Fire originated on
the north wall of the garage, where the Power Wheels vehicle was located, he focused all
of his investigative effort and information gathering on the north wall of the garage,
failing to investigate or document information pertaining to any other area, for example,
taking few, if any, Photographs of the south wall of the garage.

30.    By way of example, Mr. Wandell testified that he took 13 photographs of
the North Wall of the garage. Mr. Wandell claims that he based his opinion that the fire
originated on the north wall of the garage rather than the south wall of the garage on the
appearance of these walls and the extent to which each of them was burned.

(Wandell Deposition, Page 49)

31.    If Mr. Wandell, in fact, made such an observation to the effect that the

north wall was damaged more than the south wall, he wholly failed to record and

document these extremely pertinent characteristics of the scene in accordance with NFPA

921 in order to demonstrate his observations. Chapter 8 of NFPA 921 states as follows:

> 8-1 Introduction. In recording any fire or explosion
> scene, the investigator's goal is to record the scene
> through a medium that will allow the investigator
> to recall his or her observations at a later date and
> to document the conditions at the scene. Common
> methods of accomplishing this goal include the use
> of photographs, videotapes, diagrams, maps, overlay,
> tape recordings and notes.

32.    If, as Mr. Wandel contends, the north wall of the garage was more heavily

damaged than the south wall, this was not documented by photographs, diagrams or

otherwise. In fact just the opposite is shown in his photographs. Mr. Wandell admitted

that he took one single photograph of the south wall which was comprised of two by four

wooden studs and concrete block which, in fact, showed the wall to be completely

burned. Mr. Wandell admits that the photographs show none of the two by four wooden

studs still standing, none of the concrete block still standing and no unburned wood in

any of the wooden studs on the south wall of the garage.

33.    Mr. Wandell gave the following testimony:

    Q.    Could you take a look at Exhibit 1 and tell me which
          of the photographs in Exhibit 1 show the south wall
          of the garage.

    A.    Number 10.

    ...

    Q.    Is is fair to say that number 10 shows the south
          wall of the garage was completely destroyed in the

and is no longer standing?

A.      I wouldn't say completely destroyed. It fell out but there is still a bottom section that is intact alittle bit but it is pretty much a part on the top side of it.

Q.      The composition of the south wall was two by four studs and concrete block?

A.      Correct.

Q.      Are there any two by four studs standing?

A.      No.

Q.      Is there any concrete block standing?

A.      No.

Q.      … Is there any photograph in all of the photographs that you have produced that shows unburned wood on the south wall of the garage?

A.      No, I don't believe there is.

(Wandell Deposition, Page 50-51).

31.      Mr. Wandell, further, admitted that he took no less than 13 photographs of the north wall of the garage, where the Power Wheels was located. He admits that virtually all of these photographs show that the wood members in the north wall of the garage are still standing, and that the majority of the photographs show unburned parts of work in the north end of the garage, the garage Mr. Wandell claims was "more heavily damaged" than the south wall. (Wandell Deposition, Page 50-52)

32.      In his deposition, Mr. Wandell, further, claimed that the tires of a Ford Explorer Vehicle located in the garage were more damaged on the north side than the south side. He admits, however, that this opinion and recollection is not noted anywhere

in his written report, and that this testimony is based on "memory." Ignoring the fact that the only photographs that show the tires of the vehicles were those taken by Mr. Finneran, which show more damage on the south side of the vehicle than on the north side, and ignoring the credibility issues inherent in this sudden undocumented recollection, the fact remains that Mr. Wandell simply failed to follow appropriate procedure set forth in NFPA 921 and accepted as the guideline for those who have responsibility for fire investigation in failing to provide any documentation or photographs whatsoever of this condition.

33.     Mr. Wandell failed to even fully ascertain the contents of the area along the north wall, which he claimed was more heavily damaged than the remainder of the garage. He admits that he found the electrical outlet that Mrs. Zeigler claimed the charger was plugged into and that no charger was ever recovered and nothing that looked like the remains of a charger was ever recovered. He admits that he found wiring that would have been in the north wall of the garage which he "ruled out" as a source of ignition, but he did not photograph the condition of the wire or preserve the wire in any fashion to support his contention. He testified that he was able to identify a wagon along the north wall of the garage and some boxes but he could not identify the contents of any of the boxes and did not make any inquires to Mrs. Zeigler as to other items that may have been on the south wall or west wall of the garage.

34.     The general principles of fire investigation set forth in NFPA 921 require the thorough investigation and documentation of the fire scene, these efforts were apparently were abandoned following his formulation of the opinion that the Power Wheels toy which had been involved in the recall was in the area of fire origin.

35.     Mr. Wandell's investigation, documentation and reporting methods, present stark violations of the requirements of NFPA 921, which he agrees is the accepted guide of fire investigation. The type of expression of opinion, following an investigation in which the methods and guidelines set forth in NFPA 921 have clearly not been followed, is precisely the type of non-reliable, non-scientifically based opinion testimony which the court must preclude under *Daubert* and The Federal Rules of Evidence 702.

36.     As was set forth in the reports of Fisher-Price's expert, James Finneran, and his sworn deposition testimony, the only conclusion that can be reached with a reasonable degree of scientific certainty under the principles and guidelines set forth in NFPA 921 is that the fire originated in the garage, and that the cause of the fire must be considered undetermined based on the multiple potential ignitions sources within the garage. (Finneran Report; Finneran Deposition, page 48-53, 56-58, 78-79, submitted herewith in binder of combined Exhibits).

## C ONCLUSION

Notwithstanding that Mr. Wandell accepts that the principles of the scientific method set forth in NFPA 921, his formulation of an opinion prior to the conclusion of his investigation, his failure to have any supporting documentation or photographs of the crucial evidence upon which his opinions are based, and his failure to have his opinions grounded in procedures that followed the methods set forth in NFPA 921 render his testimony unreliable and without the requisite scientific basis for admission under The Federal Rules of

Evidence Section 702 and *Daubert*. Mr. Wandell's testimony must be

precluded.

dated: Buffalo, New York
      June 13, 2003

                        Respectfully submitted,

                        WHITFIELD & EDDY, P.L.C.
                        317 Sixth Avenue, Suite 1200
                        Des Moines, Iowa 50309-4195
                        Telephone: (515) 288-6041
                        Fax:   (515) 246-1474
                        E-Mail: Reynolds@whitfieldlaw.com

                        Kevin M. Reynolds PK0004634

                        ATTORNEYS FOR DEFENDANT
                        Fisher-Price, Inc.

                        and

                        Cheryl A. Possenti, Admitted *Pro Hac Vice*
                        GOLDBERG SEGALLA LLP
                        120 Delaware Avenue, Suite 500
                        Buffalo, New York 14202
                        Telephone: (716) 566-5400
                        Fax:  (716) 566-5401

                        By:_____
                          Cheryl A. Possenti NY Bar #1844174

                        ATTORNEYS FOR DEFENDANT
                        Fisher-Price, Inc.

Copy to:

Stephen F. Avery
Cornwall, Avery, Bjornstad & Scott
407 Grand Avenue, P.O. Box 999

Spencer, Iowa 51301
85474
ATTORNEY FOR PLAINTIFF

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing instrument was served upon all parties to the above cause or to each of the attorneys of record herein at their respective addresses disclosed on the pleadings on June_____14_____2003 by Overnight Carrier.