U.S. DISTRICT COURT

2002 JUN 25  AM 10: 42

SIOUX CITY DIV. OFFICE

| | | |
|---|---|---|
| THERESA M. ZEIGLER, individually;<br>THERESA M. ZEIGLER as mother and<br>next friend of MADISEN ZEIGLER, | : | BY |
| | : | CASE NO.C01-3089PAZ |
| Plaintiff, | : | |
| vs. | : | RESISTANCE TO MOTION TO<br>PRECLUDE TESTIMONY OF |
| FISHER-PRICE, INC. | : | ERIC JACKSON |
| Defendant. | : | |

COMES NOW Plaintiff and in resistance to Defendant's motion states:

1. The opinions of Eric Jackson fall within Rule 702 and 703 of opinion testimony by experts. Eric Jackson is an electrical engineer and specifically sets forth his opinions and the basis for those opinions in Volume I of his deposition at pp. 98-101, p. 112, p. 118 lines 20-25, p. 119 lines 1-11, p. 121 lines 1-6, p. 123 lines 21-25, and p. 127 lines 3-5. In Vol III at p. 24 lines 19-23 and p. 25 lines 1-4. Those opinions take into account the items referred to as well as the depositions which Mr. Jackson had read including Jeffrey Reynolds and Joel Taft. A portion of the Reynolds' and Taft depositions are attached to this resistance. Those depositions specifically set out the knowledge of Fisher Price of overheating in the connectors.

2. The purpose of the testimony of Eric Jackson is to assist the jury on the issue of overheating in the connectors. He is an electrical engineer and can explain when the connector has been compromised how the overheating occurs. Further, Rule 703 allows the admission of the inferences.

3. In addition, under Rule 702, Eric Jackson's testimony is based on the facts and data and upon reliable electrical engineering principles which in fact are the same principles that Jeffrey Reynolds relies upon in his testimony.

Wherefore, Plaintiff requests Defendant's motion be denied.

Stephen F. Avery 000000139
CORNWALL, AVERY, BJORNSTAD & SCOTT
407 Grand Avenue, P.O. Box 999
Spencer, Iowa 50301
Phone:      712-262-1630
Fax:        712-262-1211
Attorney for Plaintiff

Original filed.

Copy to:
Kevin Reynolds
Cheryl Possenti

CERTIFICATE OF SERVICE
The undersigned certifies that on ___6-24-03___
the foregoing instrument was served upon all parties in the
above cause by depositing a copy thereof in the U.S. Mail
postage prepaid in envelopes addressed to each of the
attorneys of record herein at their respective addresses
described in the pleadings.

Jack W. Hunt
*Founder*
1953-1998

Kevin R. Hunt
C.S.R., R.P.R.
*President*

Timothy M. Hunt
C.L.V.S
*Vice-President*

Daniel C. Hunt
M.C.N.E., C.I.O.
*Vice-President*
*Computer-Systems*



*Specialists in:*
*Court Reporting*
*Litigation Support*
*Videotaping*
*Video Teleconferencing*
*Photocopying*
*Records on Appeal*
*Computerization*

**JEFFREY REYNOLDS**



THE RECORD NEVER FORGETS

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT, CENTRAL DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

THERESA M. ZEIGLER, individually;
THERESA M. ZEIGLER as mother and
next friend of MADISEN ZEIGLER,

            Plaintiffs,

        - vs -      Index Number
                    C0-3089MWB

MATTEL, INC., a/k/a MATTEL R.S., INC.,
d/b/a FISHER-PRICE,

            Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

       Examination before trial of **JEFFREY**

**REYNOLDS**, taken pursuant to the Federal Rules of

Civil Procedure, in the law offices of GOLDBERG

SEGALLA LLP, 120 Delaware Avenue, Suite 500,

Buffalo, New York, on October 10, 2002, commencing

at 9:34 a.m., before ANNE T. BARONE, RPR, Notary

Public.



| 09:58:50 | 1 | A. We would notice that, in the vicinity of |
| 09:58:52 | 2 | the battery -- again, off the top of my head, the |
| 09:58:56 | 3 | vicinity of the battery, you could see instances |
| 09:58:58 | 4 | where plastic would be melted. You could see |
| 09:59:04 | 5 | instances where the connector may show some signs of |
| 09:59:08 | 6 | overheating. And back in the motor area, you would |
| 09:59:14 | 7 | see some melted plastic. |
| 09:59:16 | 8 | Q. You use reference to the connector? |
| 09:59:18 | 9 | A. Yes, sir. |
| 09:59:20 | 10 | Q. What connector are you referring to? |
| 09:59:22 | 11 | A. Primarily it was a white connector, |
| 09:59:24 | 12 | which we refer to as the H-style connector. |
| 09:59:28 | 13 | Q. Used to connect what? |
| 09:59:30 | 14 | A. The H-style connector, back in '96 I |
| 09:59:32 | 15 | think you asked, was on batteries. It was on |
| 09:59:38 | 16 | vehicles and was on battery chargers. |
| 09:59:44 | 17 | Q. Then let's go to '97. |
| 09:59:48 | 18 | A. Okay. |
| 09:59:48 | 19 | Q. Do you remember anything different in |
| 09:59:50 | 20 | '97 as opposed to '96? |
| 09:59:52 | 21 | A. Same patterns. |
| 09:59:52 | 22 | Q. Okay. What was your first knowledge |
| 09:59:56 | 23 | that Power Wheels was alleged to have caused a fire? |

| | | |
|---|---|---|
| 10:00:08 | 1 | A.    Probably the '95, '96 time frame. |
| 10:00:10 | 2 | Q.    And what was your first occasion to |
| 10:00:12 | 3 | learn that there was an allegation that a Power |
| 10:00:16 | 4 | Wheels had caused a house fire? |
| 10:00:22 | 5 | A.    '96, '97. |
| 10:00:26 | 6 | Q.    Was there getting to be some concern |
| 10:00:28 | 7 | within your department that these things were |
| 10:00:32 | 8 | heating up and that they were alleged to have been |
| 10:00:34 | 9 | causing some fires? |
| 10:00:36 | 10 | MS. POSSENTI:   Object to the form.   Could you |
| 10:00:38 | 11 | rephrase that? |
| | 12 | BY MR. AVERY: |
| 10:00:40 | 13 | Q.    Was there concern expressed within your |
| 10:00:42 | 14 | department that Power Wheels were the source of |
| 10:00:46 | 15 | allegations that they were causing house fires? |
| 10:00:52 | 16 | MS. POSSENTI:   I object.   It's the same |
| 10:00:54 | 17 | question.   You can answer, if you can, but note my |
| 10:00:58 | 18 | objection to the form of that. |
| 10:00:58 | 19 | THE WITNESS:   Any allegation where |
| 10:01:00 | 20 | overheating or fire was taken very -- continues to |
| 10:01:04 | 21 | be taken very serious. |
| | 22 | BY MR. AVERY: |
| 10:01:14 | 23 | Q.    Okay.   Maybe let me go about it this way |

| | | |
|---|---|---|
| 10:07:20 | 1 | was an overheating problem in Power Wheels -- |
| 10:07:22 | 2 | MS. POSSENTI: Object to the form. |
| | 3 | BY MR. AVERY: |
| 10:07:24 | 4 | Q. -- is that right? |
| 10:07:24 | 5 | MS. POSSENTI: I'll object to the form of |
| 10:07:26 | 6 | that question and ask you to rephrase that. |
| | 7 | BY MR. AVERY: |
| 10:07:28 | 8 | Q. You recalled 10 million Power Wheels, |
| 10:07:32 | 9 | correct? Fisher-Price issued a recall notice for 10 |
| 10:07:34 | 10 | million? |
| 10:07:36 | 11 | A. I don't recall the -- it was in the |
| 10:07:38 | 12 | notice, yes, sir. |
| 10:07:40 | 13 | Q. And you repaired literally millions of |
| 10:07:42 | 14 | these, correct? |
| 10:07:44 | 15 | A. We repaired an awful lot of them, yes, |
| 10:07:46 | 16 | sir. |
| 10:07:46 | 17 | Q. And you did that to -- did you do that |
| 10:07:50 | 18 | because of allegations of overheating? |
| 10:07:52 | 19 | MS. POSSENTI: Object to the form. |
| 10:07:52 | 20 | THE WITNESS: Yes, sir. |
| | 21 | BY MR. AVERY: |
| 10:07:54 | 22 | Q. And did that -- and you also became |
| 10:07:54 | 23 | aware that there were claims of a number of house |

10:11:40  1  in them or doing what people used to do in homes

10:11:44  2  where the fuse that was put in there to prevent

10:11:48  3  overcurrent, it would be replaced by I have seen

10:11:50  4  copper wires, I have seen tin foil, I have seen pop

10:11:56  5  rivets.  An awful lot of components were put in that

10:12:00  6  were not Fisher-Price or Power Wheels parts.

10:12:04  7      Once the fuse was defeated, then a

10:12:06  8  hazardous -- you know, we can't stand by exactly

10:12:12  9  what would happen with our product because people

10:12:16  10  would have tampered with it.  I may be too verbose

10:12:18  11  here.  But, so, when you say you were talking

10:12:20  12  specifically regarding connector, a connector was

10:12:22  13  one facet of it that if somebody had tampered with

10:12:26  14  the fusing system, the connector could be liable to

10:12:30  15  overheat.

10:12:32  16      Q.   And in situations where there had not

10:12:34  17  been any tampering?

10:12:36  18      A.   I've seen instances where the connector

10:12:38  19  had been damaged physically.  These connectors would

10:12:42  20  live in some instances in garages, you know, where

10:12:46  21  they would be prone to being stepped on, run over by

10:12:52  22  bicycles, cars, and damaged, in which case the

10:12:54  23  connector wouldn't behave as we had intended it to.

10:14:40 1 component. Or to say it another way: I haven't

10:14:44 2 jumped to any conclusions that products that may

10:14:48 3 come in that are charred or alleged to have been

10:14:50 4 involved in fire, I can't say where I know of any

10:14:54 5 that were absolutely -- you couldn't point your

10:14:58 6 finger at here's an electrical component that caused

10:15:02 7 the fire.

8 **BY MR. AVERY:**

10:15:02 9 Q. Why is that? So burned that you

10:15:04 10 couldn't determine it?

10:15:10 11 A. Yes. Yeah.

10:15:14 12 Q. You have seen, then, situations where

10:15:16 13 there's just a glob of plastic?

10:15:18 14 A. Yes, I have.

10:15:18 15 Q. Okay. And from that glob, you're unable

10:15:20 16 to determine where the fire started or what the

10:15:26 17 cause of the fire was?

10:15:28 18 A. Yes, that's right.

10:15:32 19 Q. Had you investigated situations -- and

10:15:36 20 I'm not asking you to say beyond any shadow of any

10:15:40 21 doubt, but just balancing it that you look at it and

10:15:46 22 think, well, I think the fire was in the component

10:15:48 23 system of the Power Wheels and I guess the cause of

| | | |
|---|---|---|
| 10:25:10 | 1 | the integrity of the Power Wheels product? |
| 10:25:12 | 2 | MS. POSSENTI: Object to the form. |
| 10:25:18 | 3 | THE WITNESS: There was more testing done |
| 10:25:22 | 4 | because the CPSC had approached us. |
| | 5 | BY MR. AVERY: |
| 10:25:26 | 6 | Q. Why had the CPSC approached you? |
| 10:25:30 | 7 | A. Because they had received some |
| 10:25:32 | 8 | allegations of fire. |
| 10:25:36 | 9 | Q. Why had you not approached CPSC? |
| 10:25:40 | 10 | MS. POSSENTI: Object to the form. |
| 10:25:44 | 11 | THE WITNESS: I don't know why |
| 10:25:44 | 12 | Fisher-Price -- I don't necessarily know what their |
| 10:25:48 | 13 | obligations were or why they didn't. That wouldn't |
| 10:25:50 | 14 | have been my department. |
| | 15 | BY MR. AVERY: |
| 10:25:54 | 16 | Q. Had you, at any time, been advised by |
| 10:25:56 | 17 | anyone in Fisher-Price as to what the obligations |
| 10:25:58 | 18 | are for reporting to CPSC? |
| 10:26:04 | 19 | A. I am generally aware of the obligations |
| 10:26:08 | 20 | for reporting. |
| 10:26:08 | 21 | Q. And how did you become aware of those |
| 10:26:10 | 22 | obligations? |
| 10:26:12 | 23 | A. My former role in quality control. |

| | | |
|---|---|---|
| 11:33:06 | 1 | Q. Should the A connector have been |
| 11:33:08 | 2 | utilized earlier than it was used? |
| 11:33:12 | 3 | MS. POSSENTI: Object to the form. |
| 11:33:24 | 4 | THE WITNESS: I don't think the H-style |
| 11:33:28 | 5 | connector was inadequate for the job. I think the |
| 11:33:30 | 6 | A connector is a more robust design, but I don't |
| 11:33:38 | 7 | think the H-style connector, you know, an |
| 11:33:40 | 8 | untampered, undamaged one was unsatisfactory to be |
| 11:33:46 | 9 | safe and reliable. |
| | 10 | BY MR. AVERY: |
| 11:33:48 | 11 | Q. The H connector was more susceptible to |
| 11:33:52 | 12 | damage through use than the A connector; is that |
| 11:34:00 | 13 | correct? |
| 11:34:02 | 14 | MS. POSSENTI: Object to the form. |
| 11:34:08 | 15 | THE WITNESS: I would say it could be damaged |
| 11:34:12 | 16 | easier than the A style. |
| | 17 | BY MR. AVERY: |
| 11:34:14 | 18 | Q. And the H connector has a longer |
| 11:34:20 | 19 | life span than the A connector by virtue of its |
| 11:34:24 | 20 | robust design? |
| 11:34:26 | 21 | MS. POSSENTI: Object to the form. |
| 11:34:28 | 22 | THE WITNESS: Could you rephrase that? I |
| 11:34:30 | 23 | want to make sure I understand if you've got H and |

| | | |
|---|---|---|
| 12:55:40 | 1 | Power Wheels were recalled in October of '98 and the |
| 12:55:42 | 2 | issue intended to be corrected. |
| 12:55:48 | 3 | First, why were they recalled? |
| 12:55:54 | 4 | A. They were recalled as an agreement |
| 12:55:58 | 5 | between Fisher-Price and the CPSC. |
| 12:56:08 | 6 | Q. And was there any decision which you |
| 12:56:12 | 7 | participated in which was a decision that there |
| 12:56:18 | 8 | needed to be a change in addition to the CPSC's |
| 12:56:24 | 9 | reasons? |
| 12:56:24 | 10 | MS. POSSENTI: Object to the form. |
| 12:56:26 | 11 | THE WITNESS: Could you rephrase that, |
| 12:56:26 | 12 | please? |
| | 13 | BY MR. AVERY: |
| 12:56:28 | 14 | Q. Well, was there anything you were |
| 12:56:30 | 15 | addressing for a reason in the recall other than |
| 12:56:32 | 16 | what CPSC was saying? |
| 12:56:40 | 17 | A. No. |
| 12:56:40 | 18 | Q. One issue that you were intending to |
| 12:56:44 | 19 | address was the overheating? |
| 12:56:46 | 20 | A. Yes. |
| 12:56:46 | 21 | Q. What other issues were you attempting to |
| 12:56:50 | 22 | address in the recall? |
| 12:56:52 | 23 | A. The fuse tampering or tampering with the |



Jack W. Hunt
*Founder*
1920-1993

Kevin R. Hunt
C.S.R., R.P.R.
*President*

Timothy M. Hunt
C.L.V.S.
*Vice-President*

Daniel C. Hunt
M.C.N.E., C.I.O.
*Vice-President*
*Computer Systems*

*Specialists in:*
*Court Reporting*
*Litigation Support*
*Videotaping*
*Video Teleconferencing*
*Photocopying*
*Records on Appeal*
*Computerization*

**JOEL TAFT**



THE RECORD NEVER FORGETS

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT, CENTRAL DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

THERESA M. ZEIGLER, individually;
THERESA M. ZEIGLER as mother and
next friend of MADISEN ZEIGLER,

              Plaintiffs,

        - vs -      Index Number
                   C01-3089MWB

MATTEL, INC., a/k/a MATTEL R.S., INC.,
d/b/a FISHER-PRICE,

              Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

       Examination before trial of JOEL **TAFT**,

taken pursuant to the Federal Rules of Civil

Procedure, in the law offices of GOLDBERG SEGALLA

LLP, 120 Delaware Avenue, Suite 500, Buffalo, New

York, on December 12, 2002, commencing at 9:01 a.m.,

before ANNE T. BARONE, RPR, Notary Public.



*JACK W. HUNT & ASSOCIATES, INC.*

09:01:58 1     Q.   First, maybe to get things started and

09:02:02 2  to move along, if you could just give me a quick

09:02:04 3  synopsis of your education and your work history

09:02:08 4  since graduating from your last institution.

09:02:12 5     A.   Okay.  My education, I have a BS in

09:02:16 6  geology from the University of Buffalo.  I also have

09:02:20 7  a master's in environmental engineering from the

09:02:22 8  University of Buffalo.  An MS.  I worked in the

09:02:28 9  environmental engineering arena for almost nine

09:02:30 10  years with a couple different companies doing

09:02:34 11  hazardous waste site assessments, things of that

09:02:36 12  nature.

09:02:38 13     After that, I was employed with ACTS Testing

09:02:40 14  Labs, who does consumer products testing for a

09:02:44 15  variety of different types of consumer products.  I

09:02:46 16  was there for about four and a half years before I

09:02:50 17  became a safety engineer for Fisher-Price October of

09:02:54 18  2000.  And I've been in the safety engineering at

09:02:58 19  Fisher-Price since that time.

09:02:58 20     Q.   How did you happen to get to the toy

09:03:00 21  business?

09:03:02 22     A.   That was through ACTS Testing basically

09:03:04 23  because they do a lot of toy testing over there.  I

09:27:48    1          MS. POSSENTI:  Object to the form.

09:27:48    2          THE WITNESS:  From a dollar standpoint, I

09:27:50    3    understand it was a pretty big recall.

            4          BY MR. AVERY:

09:27:52    5          Q.    And did they tell you why the recall

09:27:54    6    occurred?

09:27:58    7          A.    It was my understanding that it was

09:28:00    8    connectors overheating.

09:28:02    9          Q.    And do you recall who told you that?

09:28:08   10          A.    No.

09:28:08   11          Q.    In the discussion about the connectors

09:28:12   12    overheating, did you learn that they had changed the

09:28:14   13    connector?

09:28:14   14          A.    Yes.

09:28:14   15          Q.    From an H style to an A style?

09:28:18   16          A.    That's right.

09:28:20   17          Q.    I have one curiosity that I haven't had

09:28:22   18    answered, I guess.  One is white in color and one is

09:28:26   19    black in color.  Is that just to differentiate

09:28:28   20    between the type of connector, or is there some

09:28:30   21    reason why one's white and one's black?

09:28:32   22          MS. POSSENTI:  Object to the form.

09:28:34   23          THE WITNESS:  I don't know.

09:29:48  1  that with that overheating, the plastic was catching

09:29:50  2  fire?

09:29:52  3  　　　　MS. POSSENTI:  Object to the form.

09:29:52  4  　　　　THE WITNESS:  No.

　　　　　5  　　　　BY MR. AVERY:

09:29:58  6  　　　　Q.  Did they tell you what they did to solve

09:30:00  7  this complaint of overheating in the connectors?

09:30:04  8  　　　　MS. POSSENTI:  Object to the form.

09:30:04  9  　　　　THE WITNESS:  All I know is that, ultimately,

09:30:06  10  as a product improvement, they changed from the

09:30:10  11  H- to the A-style connector.

　　　　　12  　　　　BY MR. AVERY:

09:30:12  13  　　　　Q.  And that change occurred before you came

09:30:16  14  on board?

09:30:18  15  　　　　A.  Yes.

09:30:18  16  　　　　Q.  After you came on board, did you learn

09:30:22  17  whether there had been any complaints of overheating

09:30:28  18  in the A-style connector, which was the new one?

　　　　　19  　　　　A.  No.

09:30:36  20  　　　　Q.  Have you ever heard of an A-style

09:30:38  21  connector overheating?

09:30:40  22  　　　　A.  No.

09:30:42  23  　　　　Q.  Is it your understanding that the change

09:30:44  1  to the A style then solved the overheating problem?

09:30:46  2        **MS. POSSENTI:**  Object to the form.

09:30:50  3        **THE WITNESS:**  It appears that the A style

09:30:52  4  does not overheat.

        5        **BY MR. AVERY:**

09:30:52  6        Q.   And then at the cage meeting, did

09:30:54  7  everybody say, the H connector was the problem; the

09:31:00  8  A style has solved the problem?

09:31:02  9        **MS. POSSENTI:**  Object to the form.

09:31:08  10        **THE WITNESS:**  The A style -- I don't know

09:31:08  11  whether you can say it solved the problem, but,

09:31:10  12  obviously, there are some overheatings with the

09:31:14  13  H style.

        14        **BY MR. AVERY:**

09:31:16  15        Q.   Okay.  And -- okay.  Was there ever any

09:31:20  16  discussion of:  Well, at least we got that problem

09:31:22  17  out of the way and we're not going to have fires in

09:31:24  18  Power Wheels?

09:31:26  19        **MS. POSSENTI:**  Object to the form.

        20        **BY MR. AVERY:**

09:31:26  21        Q.   Because of connectors at least?

09:31:28  22        **MS. POSSENTI:**  Object to the form.

09:31:28  23        **THE WITNESS:**  I never heard that we had fires

09:43:16  1           **THE WITNESS:**  No.  I don't get those reports.

          2           **BY MR. AVERY:**

09:43:18  3           Q.   But did you have any oral discussion

09:43:20  4   afterwards?  Like, would Reynolds say, well, the

09:43:24  5   experts found such-and-such?

09:43:34  6           A.   No.

09:43:34  7           Q.   When those cases -- or when those boxes

09:43:36  8   of melted plastic were presented at the cage

09:43:40  9   meeting, were there any comments as to any

09:43:44  10  speculation as to what happened or what caused it to

09:43:48  11  become a box of melted plastic?

09:43:50  12          A.   No.

09:43:52  13          **MS. POSSENTI:**  Object to the form.

          14          **BY MR. AVERY:**

09:44:14  15          Q.   Can you give me an estimate of how many

09:44:16  16  times after you started with Fisher-Price that you

09:44:22  17  saw -- and I'm just asking for an estimate how many

09:44:26  18  times you saw evidence of some type of a Power

09:44:32  19  Wheels that had been in a fire.

09:44:38  20          A.   Well, evidence of fire or a claim of

09:44:40  21  fire?  I guess that's --

09:44:42  22          Q.   Claimed fire.

09:44:42  23          A.   You get a lot of claims of fires.

09:44:44  1        Q.    Where you saw the product.

09:44:46  2        A.    For claims of fires?

09:44:48  3        Q.    Yes.

09:44:50  4        A.    I can't put a number on it, but there's

09:44:52  5   numerous claims of fires.

09:44:54  6        Q.    Can you give me an idea?

09:44:56  7        A.    It's hard to throw a number out there.

09:45:02  8        Q.    All right. As far as do you have any

09:45:04  9   idea as to how many went to forensics?

09:45:08  10       A.    I want to say on the order of a dozen or

09:45:12  11  two.

09:45:14  12       Q.    And do you know --

09:45:18  13       A.    Let me rephrase that. It's not that

09:45:20  14  went to forensics. That was recommended to go to

09:45:22  15  forensics.

09:45:24  16       Q.    All right.

09:45:24  17       A.    I don't know if that ever made it that

09:45:28  18  far.

09:45:28  19       Q.    And do you know, when they made the

09:45:30  20  recommendation to go to forensics, where was

09:45:34  21  forensics? Was it internal in Fisher-Price?

09:45:36  22       A.    To my knowledge, our forensics expert is

09:45:38  23  someone we hire from outside the company.

09:53:28 1 overheating.  Other than that, if you can't

09:53:30 2 determine it, you just state it was overheated.

3         **BY MR. AVERY:**

09:53:38 4         Q.   Would you see reports where they said

09:53:40 5 the connectors were overheated?

09:53:42 6         A.   Yes.

09:53:42 7         Q.   How many of those did you see?

09:53:46 8         A.   Again, it's hard to put a number onto

09:53:50 9 that, but I have seen them.

09:53:54 10        Q.   And did you see -- in the case of where

09:53:56 11 there was a melted glob, did you see any reports

09:54:00 12 where they identified the cause of the overheating?

09:54:06 13        A.   No.  As I said, I don't get those

09:54:08 14 reports, so I don't know what happens to them.

09:54:10 15        Q.   All right.  You never saw those.

09:54:14 16        On the log itself, would there be any

09:54:16 17 notation on the glob -- the melted glob situations?

09:54:20 18        A.   The log itself would have a

09:54:22 19 save-for-Finneran check box on there.

09:54:24 20        Q.   I see.  And that was a regular printed

09:54:28 21 box?

09:54:28 22        A.   Right.  There's a certain sheet and the

09:54:30 23 format to the sheet that has boxes you can check for