| | |
|---|---|
| THERESA M. ZEIGLER, individually; THERESA M. ZEIGLER as mother and next friend of MADISEN ZEIGLER, | CASE NO. C01-3089PAZ |
| Plaintiff, | |
| vs. | PLAINTIFF'S RESISTANCE TO DEFENDANT'S MOTION TO PRECLUDE TESTIMONY OF BRUCE WANDELL |
| FISHER-PRICE, INC. | |
| Defendant. | |

COMES NOW Plaintiff and in resistance to Defendant's motion to preclude testimony of Bruce Wandell states:

1. Bruce Wandell is a trained fire investigator and conducted a very detailed investigation of this fire scene, which investigation is set forth in the first 120 pages of his deposition. At page 140 of his deposition at lines 13-20, Mr. Wandell outlines his "scientific method" of conducting a fire scene investigation. It is interesting that this motion to preclude testimony is based on his refusal to adopt the NFPA 921 as a "bible" as opposed to a "guide". The procedure he outlines at page 140 lines 13-20 and the procedure he details in the first 120 pages of his deposition specifically follows the guidelines of NFPA 921.

2. Mr. Wandell was careful not to form an opinion prior to his investigation, which is very opposed to the methodology used by James Finneran who is the expert of Fisher Price, Inc. As shown in the deposition of Theresa Zeigler at page 77 lines 11-25, page 78 lines 1-3, page 79 lines 21-25, and page 80 line 1 Mr Finneran had established his opinion

before he ever commenced his investigation of the fire scene.

3. As indicated by the depositions of Wandell and Finneran their procedures were similar, absent the preinvestigation opinion by Finneran. Any ruling barring Wandell would apparently apply to Finneran as well.

4. Both of these investigations commenced outside and worked from the least damaged area to the greatest damage. The opinions differ on source by the width of the garage. Each has a reasoned opinion and should be allowed to explain the opinion

WHEREFORE, Plaintiff request Defendant's motion be overruled.

Stephen F. Avery 000000139
CORNWALL, AVERY, BJORNSTAD & SCOTT
407 Grand Avenue, P.O. Box 999
Spencer, Iowa 51301
Phone: 712-262-1630
Fax: 712-262-1211
Attorney for Plaintiff

Original filed.
Copy to:
Kevin Reynolds
Cheryl Possenti

CERTIFICATE OF SERVICE
The undersigned certifies that on 6-24-03 the foregoing instrument was served upon all parties to the above cause by depositing a copy thereof in the U.S. Mail postage prepaid in envelopes addressed to each of the attorneys of record herein at their respective addresses described in the pleadings.

Dana Andersen

```
 1           IN THE UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT
 2                    CENTRAL DIVISION

 3     THERESA M. ZEIGLER, individually;
       THERESA M. ZEIGLER as mother and
 4     next friend of MADISEN ZEIGLER,

 5           Plaintiffs,

 6           vs.                        No. C01-3089-MWB

 7     MATTEL, INC., a/k/a
       MATTEL RS, INC. d/b/a
 8     FISHER-PRICE,                    DEPOSITION OF

 9           Defendant.                 THERESA ZEIGLER

10     ─────────────────────────────────

11           The deposition of Theresa Zeigler, taken on

12     behalf of the Defendant, before Karen L.

13     Hargens, Certified Shorthand Reporter and Notary

14     Public, commenced at 1:37 p.m., the 21st of

15     August, 2002, at the law offices of Cornwall,

16     Avery, Bjornstad & Scott, Spencer, Iowa.

17     APPEARANCES:

18         Mr. Stephen F. Avery, Attorney at Law
         (Cornwall, Avery, Bjornstad & Scott), 407 Grand
19       Avenue, P.O. Box 999, Spencer, Iowa  51301

20                 for the Plaintiffs;

21         Mr. Kevin M. Reynolds, Attorney at Law
         (Whitfield & Eddy), 317 Sixth Avenue, Suite
22       1200, Des Moines, Iowa  50309-4195

23                 for the Defendant.

24

25
```

74

1  Q  And neither you nor Madisen was present at the
2     house when the fire started; correct?
3  A  When it started, that's correct.
4  Q  And does Madisen see a pediatrician, or does she
5     see a family practice doctor?
6  A  Family practice doctor.
7  Q  And who is Madisen's doctor?
8  A  Dr. Stangl. She also sees Dr. Jorgensen because
9     she's had quite a bit of trouble with her ears.
10 Q  Is Jorgensen like an ENT?
11 A  Yes.
12 Q  Ear, nose and throat specialist?
13 A  Yes.
14 Q  And then Stangl is a family practice doctor?
15 A  Yes. He is in Estherville.
16 Q  Are they both in Estherville?
17 A  Jorgensen is located here in Spencer.
18 Q  Has she had to have ear tubes?
19 A  Yes. She just got her second set earlier this
20    year.
21 Q  Do you remember when she had her first set?
22 A  When she was 4.
23 Q  Has Madisen seen any other doctors other than
24    Dr. Stangl or Dr. Jorgensen?
25 A  No, she hasn't.

75

1  Q  Has Dr. Stangl --
2  A  I take that back. She did see Jodi Haugen who
3     is a physician's assistant at the Estherville
4     clinic.
5  Q  Is that the same office as Dr. Stangl?
6  A  Yes, it is.
7  Q  And what did the physician's assistant see
8     Madisen for, do you know?
9  A  I think a cold.
10 Q  Has Madisen or you received any medical
11    treatment for emotional distress or
12    psychological injury or problems of that type
13    related to this fire incident?
14 A  I visited with Jodi Haugen off and on about
15    different things. I have taken an
16    antidepressant for quite a while, even prior to
17    the fire. But we had talked about going off of
18    it and so forth and opted not to do that at that
19    time because of the trauma of the fire. She
20    advised me not to at that time.
21 Q  Do you presently take any antidepressant?
22 A  Yes, I do.
23 Q  Is that a prescription medicine?
24 A  Yes.
25 Q  What medicine is it?

76

1  A  Paxil.
2  Q  And when were you first prescribed that?
3  A  I would have to go back and check. I don't
4     know.
5  Q  But it was prior to the fire?
6  A  It was prior to the fire.
7  Q  Do you know what dosage you take?
8  A  40 milligrams.
9  Q  Do you take anything else for -- you know, as an
10    antidepressant or anxiety or whatever?
11 A  No. That's the only thing.
12 Q  Does Madisen take anything?
13 A  No, she doesn't.
14 Q  Have you specifically been prescribed anything
15    to help alleviate emotional distress or mental
16    distress or things of that nature related to
17    this fire?
18 A  Not specifically, no.
19 Q  And same answer for Madisen?
20 A  Correct.
21 Q  In the interrogatory answers -- I'm switching
22    gears here -- there's a reference to a brief
23    conversation you had with an investigator that
24    came out to the fire scene. And I think his
25    name was Jim Finneran, but I don't know if you

77

1     would remember his name or not.
2  A  I did not remember his name, but I know who
3     you're talking about.
4  Q  He was there on behalf of Fisher-Price or
5     Mattel, whatever you want to call it. Tell me
6     as specifically as you can, Theresa, what you
7     remember about that conversation.
8  A  It was a short conversation.
9  Q  I think this was actually in June a few days
10    after the fire?
11 A  Uh-huh. (Witness indicated affirmatively.)
12    After introductions -- after he introduced
13    himself -- and I'm paraphrasing. I'm not
14    quoting. I think I'm pretty close to quote on
15    the first part. He said, so what makes you
16    think -- what makes you think our product caused
17    your fire? And what alarmed me -- or what noted
18    my attention to this more than his words was his
19    tone. It was a very sarcastic tone, in my
20    opinion. And I said, well, I'm just going on
21    what the firemen have told me and the fire
22    investigator. And he said -- his next phrase
23    then -- and I'm paraphrasing -- was, I think my
24    visit or I think our findings will find
25    something else or that they're wrong or we'll

**78**

       find something else basically. That's what he
was saying, but I can't quote him exactly. But
that is what I understood him to say.

Q And I think that's consistent with what you had
stated in the interrogatories. And let me just
read this answer into the record here. It's
Answer to Interrogatory No. 1. And it states
and I quote, "The only conversation with a
representative of Defendant was with James
Finneran. He came to inspect the fire scene.
The location was in my driveway a few days after
the fire." Is that where you recall talking
with him?

A Yep.

Q "He had not yet gone onto the fire scene. But
his comment was, quote, 'What makes you think
our product caused your fire?'," end quote. In
your answer to interrogatory you've got that in
quotes. But as you've stated here today, you're
paraphrasing him as best you can recall?

A However, that statement is pretty accurate to a
quote, I mean, the first thing he said, because
it kind of stuck in my mind. Not only his
words, but his tone.

Q And it may not have been the exact words that he

**79**

used?

A That's correct.

Q But it gives you a feel for his intonation or
his tone?

A Correct.

Q And then I'll continue reading here. "That was
the first thing he said. He said this in a
sarcastic manner." And I think you've told us
about that. "I then repeated to him what the
firemen had told me. He then said, quote, 'My
feelings are that my findings will indicate that
our product did not cause the fire'," end quote.
And then on your interrogatory answer you've got
paraphrased there.

A Yeah.

Q So again, those may not have been the exact
words he used, but that's the sum and substance
of what he was saying; is that correct?

A That is correct.

Q And then to continue on to finish the answer,
"All of this was prior to his setting foot on
the fire scene."

A That is true. He was standing beside his car
putting on his gloves at the time.

Q He had just arrived?

**80**

A Yes.

Q Can you tell me, Theresa, as best you can recall
what the firemen told you in terms of the cause
of the fire? And you may have had several
different conversations with different guys.
But I just need to find out as much as I can.

A First thing that I remember being told is when
the fire was out -- pretty much out, I walked
around into my driveway at that time looking
into the garage -- looking to the west into the
garage. And the fireman -- and I believe Randy
Cody was one of them -- had a light and shined
it and said, do you recall what was sitting
right there? And I said, yeah, that's where my
daughter's Barbie Jeep was parked. And he said,
well, we believe that's where the fire started.
And I said, I just plugged it in earlier that
day to charge it up. And that was the first
time that I was told -- that I recall being told
by a fireman that that's where the fire had
started and that's what they thought caused the
fire.

Q And you mentioned Randy Cody?

A Uh-huh. (Witness indicated affirmatively.)

Q Did you know him at all before this fire?

**81**

A No, I did not.

Q Did you have any other conversations later? It
may have been a few days after or --

A I know after Bruce Wandell came, I visited with
him. And I was on the site when he was doing a
lot of the investigation. And I asked him
questions about different things, and he
answered my questions very politely.

Q Who did you understand him to be, Theresa?

A A fire investigator representing Allied
Insurance.

Q Do you remember what you asked him?

A I asked him what would indicate the fire started
there. And he showed me different things, the
charring of the studs in the wall and just
different things. Some of it I knew from prior
knowledge or whatever. But it was
interesting -- I was just more interested, I
guess, in what he was doing. He very politely
was just answering my questions.

Q Do you recall asking him anything other than,
you know, what would indicate that the fire
started here? I mean, specifically do you
remember any questions that you posed to him?

A I remember one question I asked him. He was